IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|                                |     |              |
|--------------------------------|-----|--------------|
| TYRONE LUVOID HUTCHERSON       | §   |              |
|                                | §   |              |
| v.                             | §   | 2:11-CV-0270 |
|                                | §   |              |
| UNITED STATES OF AMERICA       | §   |              |

## REPORT AND RECOMMENDATION
## TO DENY MOTION TO VACATE, SET ASIDE,
## OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

Defendant TYRONE LUVOID HUTCHERSON has filed a Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255 challenging his conviction for two (2) counts of

bank robbery.  For the reasons set forth, the undersigned United States Magistrate Judge is of the

opinion defendant is not entitled to relief and recommends the motion be DENIED.

I.
FACTS AND PROCEDURAL HISTORY

The following summarization of the facts of this case is taken from the opinion of the United

States Court of Appeals for the Fifth Circuit on defendant's direct appeal of his conviction:

> On April 3, 2008, the Hale County State Bank in Plainview, Texas was robbed and
> $10,905 in cash was taken.  On April 29 of the same year, the Happy State Bank in
> Amarillo, Texas was robbed and $11,352 in cash was taken.  Tyrone Luvoid
> Hutcherson was arrested in the Northern District of Texas on May 3, 2008 on a
> Kansas escape warrant.  On June 17,2008, he was indicted by a federal grand jury for
> the Happy State Bank in Amarillo robbery.  Hutcherson's indictment for that robbery
> was precipitated by a tip to the Amarillo police by Robert Powell, the brother of
> Hutcherson's girlfriend Tynisha Winkfield.  Winkfield's parents, O'Neal and Barbara
> Yarborough, had seen security images of the Amarillo bank robbery on their local
> news station and had called Powell because they suspected the images were of
> Hutcherson.  Powell agreed with the Yarborough's identification and notified the
> authorities.

The grand jury which indicted Hutcherson also indicted Tynisha Winkfield on charges of misprision of felony under 18 U.S.C. § 4 and accessory after the fact under 18 U.S.C. § 3. On July 1, 2008, Hutcherson mailed a handwritten letter to Winkfield from jail in which he confessed to the robbery of the Happy State Bank in Amarillo. On September 1, 2009, the grand jury issued a superseding indictment against Hutcherson charging him with the robbery of the Hale County State Bank in Plainview as well as the Amarillo robbery. The superseding indictment did not include any charges against Winkfield, which were dropped at the government's request.

At trial, the jury heard considerable evidence against Hutcherson. The bank teller at the Happy State Bank as well as the bank teller at the Hale County State Bank identified Hutcherson as the perpetrator. Hutcherson was also identified both in a photo array and at trial by a woman who chased the robber in her car for a short distance as he ran from the Plainview bank with stolen cash. Investigators who searched Hutcherson and Winkfield's residence at the time of Hutcherson's arrest discovered envelopes containing four hundred one-dollar bills as well as thirty two-dollar bills. Thirty-two two-dollar bills were stolen from the Happy State Bank in Amarillo. Additionally, Winkfield made two substantial cash payments on a car after the robberies. One was made two days after the Plainview robbery in the amount of $1,300 and the second was made two days after the Amarillo robbery in the amount of $1,700. The jury found Hutcherson guilty of both counts of robbery. He was sentenced to 240 months on each count, the sentences to run concurrently. The advisory guideline range calculated was based on the designation of Hutcherson as a career offender.[1]

On November 29, 2010, the Fifth Circuit affirmed defendant's conviction and sentence on direct appeal. *United States v. Hutcherson*, No. 10-10078. Rehearing was denied December 21, 2010. Defendant did not seek further direct review by filing a petition for certiorari with the United States Supreme Court. Instead, on November 14, 2011, defendant filed the instant motion to vacate.

II.
DEFENDANT'S ALLEGATIONS

Defendant alleges his conviction is in violation of the Constitution and/or laws of the United States because:

A.      He was denied effective assistance of counsel because counsel failed to:

---

[1]The Government's response sets forth a more detailed recitation of the facts, taken from the Presentence Report and the appellate court decision. *See Response to 28 U.S.C. § 2255 Motion*, at 3–7.

1.  File a motion to suppress evidence seized from defendant's girlfriend's house as violative of defendant's Fourth Amendment rights;

2.  Object to the introduction of a sweatshirt and pair of sunglasses at trial on the ground that the prosecution failed to disclose to the defense the photos of the items presented to witnesses for identification purposes;

3.  Allow defendant to testify at trial;

4.  Call a subpoenaed witness to testify at trial;

5.  Impeach the testimony of an unidentified government witness with the witness's history of "severe mental problems" and failed to impeach "several testifying witnesses" with their prior criminal histories;

6.  Argue for dismissal of the case for prosecutorial misconduct when the government:

    a.  did not correct an inaccuracy in a witness's trial testimony; and

    b.  did not correct a witness's trial testimony when it differed from his grand jury testimony.

7.  Request results of tests presumably conducted on a cap found in the street near the Amarillo robbery;

8.  Object to a 5-level increase under USSG § 2B3.1(b)(2)(C) for brandishing or possessing a "firearm" during the commission of an offense; and

9.  Object to the application of the career-offender provision under USSG § 4B1.1.

B.  Evidence seized from defendant's residence in violation of the Fourth Amendment was used against defendant during trial;

C.  Evidence in violation of *Brady v. Maryland* was used against defendant during trial; and

D.  The Government committed prosecutorial misconduct by failing to correct trial testimony of a Government witness.

E.      The evidence was insufficient to prove defendant committed the offenses of
        which he was convicted.


III.
STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may move the convicting federal court to vacate,

set aside, or correct his conviction or sentence.  However, such a motion is "reserved for

transgressions of constitutional rights and for that narrow compass of other injury that could not

have been raised on direct appeal, and would, if condoned, result in a complete miscarriage of

justice." *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).  There are four grounds upon

which a federal prisoner may move to vacate, set aside, or correct his sentence: (1) the sentence was

imposed in violation of the Constitution or laws of the United States; (2) the court was without

jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or

(4) the sentence is "otherwise subject to collateral attack."  *United States v. Placente*, 81 F.3d 555,

558 (5th Cir. 1996).

A section 2255 collateral challenge, however, "may not do service for an appeal."  *United

States v. Frady*, 456 U.S. 152, 165 (1982).  Therefore, constitutional claims which could have been

raised on direct appeal cannot be raised for the first time in a section 2255 motion unless the

prisoner can show both "cause" for his failure to raise the issue on appeal and "actual prejudice"

resulting from the constitutional violation, or that the constitutional violation has probably resulted

in the conviction of one who is actually innocent.  *United States v. Shaid*, 937 F.2d 228, 232 (5th

Cir. 1991).

IV.

INEFFECTIVE ASSISTANCE OF COUNSEL

In its response, the Government has set forth the proper standard under *Strickland v.*

*Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) and its progeny for

reviewing claims of ineffective assistance of counsel in post-conviction proceedings brought under 28

U.S.C. § 2255.  Defendant's claims are analyzed under that standard.

A.

Suppression of Evidence

After learning of [defendant's] identity from Powell's tip, authorities discovered
[defendant] had a federal arrest warrant on a charge of escape.  Executing the
warrant, a team of local and federal law enforcement agents arrested [defendant]
outside the home he shared with Winkfield in Tulia on May 3, 2008, but not before
trying to escape on foot.  At the time of his arrest, [defendant] had approximately
$3,300 in the following denominations:  16 $100 bills, 26 $50 bills, 18 $20 bills, 6
$5 bills, and 8 $1 bills.

After taking [defendant] into custody, agents received Winkfield's consent to search
their shared residence.  In the closet, agents found five envelopes containing the
following amounts of one-dollar bills:  100, 100, 150, 21, and 50.  Loose among the
envelopes were 30 two-dollar bills – 32 two-dollar bills had been taken from Happy
State Bank.  And agents found a black BB/pellet pistol matching the bank teller's
description of the weapon used in the Amarillo robbery.[2]

Defendant argues counsel was deficient because she failed to file a motion to suppress the

evidence seized from his girlfriend's house.  Defendant contends if such a motion had been filed, it

would have been granted because the officers did not have a search warrant to search the house, the

money and gun were found in bags in the bedroom closet and were not in plain view, and the

officer's did not have defendant's permission to view the contents of the bag in the closet.

Defendant also claims the search was not valid because officers used the warrant for his arrest on

the federal escape charge as a pretext to conduct the search.  Defendant appears to claim he was

---

[2]Government's *Response to 28 U.S.C. § 2255 Motion* at 5.

prejudiced by counsel's failure to file the suppression motion because he would have been acquitted if the motion had been filed and granted and the evidence suppressed. Defendant's claim is without merit.

As correctly noted by respondent, "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (*citing Illinois v. Rodriguez*, 497 U.S. 177 (1990); *United States v. Matlock*, 415 U.S. 164 (1974)). Thus, 'when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' *Matlock*, 415 U.S. at 170."

At trial, the Government presented evidence that Winkfield rented and lived in the Tulia residence and that defendant moved in with her in January 2008. On May 3, 2008, agents went to that shared residence to arrest defendant on the federal escape warrant. After arresting defendant, Winkfield consented to a search of the residence. Officer James McKenny of the Amarillo Police Department testified that in a closet on the west wall of the bedroom, up against the wall on a shelf, he found envelopes filled with cash "inside of a Crown Royal bag." Defendant has not presented anything showing Winkfield did not have authority to consent and allow agents to search the home. Nor has defendant shown Winkfield's consent was limited in any way. Defendant has presented nothing to indicate the officers' search of the shared closet space or of the contents of the "Crown Royal" bag found in the closet exceeded the scope of Winkfield's consent. "[T]hird-party consent limits a person's ability to challenge the reasonableness of the search only because that person

voluntarily has relinquished some of his expectation of privacy by sharing access or control over his property with another person." *Rodriguez*, 497 U.S. at 194.

In his response to the Government's answer, defendant appears to clarify his claim, stating he "does not dispute the 'search of his residence' provided with consent," but objects to the scope of the search as being into envelopes and other containers.  HUTCHERSON has not shown, however, that Ms. Winkfield limited her consent to search or objected to the search at any time.  Failure to limit the scope of a consensual search can be considered as an indication the search was within the scope of the initial consent.  *United States v. Mendez*, 431 F.3d 420 (5th Cir. 2005).  *See also Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

Nor has HUTCHERSON established that the execution of the arrest warrant tainted the subsequent request for consent to search, or that any actions by the officers were inappropriate or unconstitutional.  Any motion to suppress would have been denied.  Consequently, defendant fails to show defense counsel was defective in failing to file a motion to suppress the evidence found at the residence he shared with Winkfield.  Defendant's claim should be denied.

B.

Objection to Sweatshirt and Sunglasses Evidence

At trial, Maria Longoria, the bank teller victim of the April 3, 2008 Plainview robbery, testified the robber was wearing a dingy-white hooded sweatshirt, sunglasses, a dark cap, blue jeans, and a Blue Tooth accessory on his ear.  Vol. I at 32.  Alisa Alexander, a witness who observed the robber as he exited the Plainview bank, testified the robber was wearing a white or gray hooded sweatshirt, baseball cap, and blue jeans, but she could not recall if he had sunglasses on or not.  Vol. I at 64–65.

Texas Ranger Marshall Thomas testified his May 5, 2008 search of the residence defendant

shared with Ms. Winkfield included looking for articles of clothing similar to those worn by the

suspect during the robberies.  As a result, Thomas seized a white hooded sweatshirt and sunglasses

that appeared to be the same or similar to the items worn during the Plainview bank robbery.

Thomas testified that for identification purposes, he showed the actual sweatshirt and sunglasses to

both the Plainview bank teller, Ms. Longoria, and to Ms. Alexander, the witness who observed the

robber exit the bank.  On the same dates, he presented the witnesses with photo arrays of possible

suspects.  Vol. I at 85-106.

On cross-examination, Longoria acknowledged there was nothing unusual or special about

the sweatshirt and sunglasses, and that she did not notice any distinctive markings, emblems,

insignia, or labels on either.  Longoria acknowledged the robbery happened quickly and she was

scared, but confirmed that although she looked down at the note and into her money drawer, she

was also looking at the robber.  At trial, Longoria identified the sweatshirt and sunglasses recovered

from defendant's residence as the same or similar to the ones worn by the robber.  Longoria

testified that Ranger Thomas presented the sweatshirt and sunglasses to her for identification on the

same day he presented the photo array.  Vol. I at 40-56.

On cross-examination, Alexander testified she remembered the hooded sweatshirt "very

well" but could not remember the sunglasses.  Alexander also acknowledged there was nothing

unusual about the color or style of the sweatshirt and that she did not recall any insignia or emblem

on the sweatshirt.  Alexander identified the sweatshirt recovered from defendant's residence as

being the same or similar to the one worn by the robber.  Alexander testified that Ranger Thomas

presented her with a photo of the sweatshirt, rather than the item itself, for identification on the

same day he presented the photo array to her.  Vol. I at 70-76.

On cross-examination, Ranger Thomas clarified the hooded sweatshirt and sunglasses only

had insignia labels on the inside.  Thomas acknowledged he did not find a Bluetooth device or any caps at the residence.  The sweatshirt and sunglasses were introduced into evidence, without objection during Ranger Thomas's testimony.  The photos of the sweatshirt were not offered into evidence by either party.  Vol. I at 86-106.

Defendant first appears to argue counsel was deficient because she did not object to the Government's introduction of the sweatshirt and sunglasses into evidence on the ground that the Government failed to disclose the photographs of the actual items to the defense.  Defendant attaches to his pleading a page reflecting three (3) photos of the sweatshirt.[3]  Defendant contends the photos, rather than the sweatshirt itself, were presented to the witnesses "as a tool of identification."

First, there is nothing indicating the photos defendant attaches to his motion were used during trial or were admitted into evidence.  Instead, the sweatshirt and sunglasses themselves were offered and admitted.  Any failure by the Government to disclose photographs of the evidence would not have provided defense counsel with a valid objection to the admission of the actual evidence itself.

If, instead, it is defendant's argument that counsel should have objected to the admission of the actual items on the basis that the Government failed to disclose the fact that law enforcement showed the photos, rather than the items themselves, to one of the witnesses of the Plainview bank robbery, defendant's argument fails.  First, defendant has failed to conclusively show the photos, rather than the items themselves, were shown to the witness.  The Plainview bank teller and Ranger Thomas both testified the items themselves were presented for identification.  While witness Alexander, who observed the robber exiting the bank, testified she was only shown a photo of the

---

[3]The attachment does not identify the source of the photos.

sweatshirt, her testimony was disputed by Ranger Thomas's testimony.  Second, even if witness

Alexander's recollection is correct, defendant fails to show how any failure by the Government to

disclose that law enforcement showed photos of the evidence to one of the witnesses was improper

or provided defense counsel with a valid objection to the introduction of the evidence itself.

Defendant has not stated what valid objection could have been made to the admission of the

sweatshirt and sunglasses.  The bank security photos reflected the robber was wearing a white or

grayish hooded sweatshirt and sunglasses.  A similar hooded sweatshirt and sunglasses were seized

from defendant's residence, and the Plainview bank teller and the witness who observed the robber

leaving the bank both identified these items as the same or similar to the ones worn by the robber.

There was no valid objection for defense counsel to make.

Defendant also contends, however, that he "was not allowed to view the evidence until trial"

and so "was not allowed to dispute the noticeable difference[s]" between the sweatshirt and

sunglasses found during the search of the residence and those worn by the Plainview bank robber as

seen on the security camera image.  Defendant maintains that when he was finally given the

opportunity to view the evidence at trial, he identified these differences to defense counsel but she

failed to object to the admission of the evidence or point out the differences to the jury.  Defendant

appears to contend an objection would have been sustained and the evidence would have been

excluded, or counsel could have convinced the jury that the items found at his residence were not

the items used during the robbery.

Nothing in the record indicates any unfair surprise to the defense.  Defendant fails to show

the defense "was not allowed to view the evidence until trial."  Moreover, defendant fails to inform

the Court what "noticeable difference[s]" there were which he contends defense counsel should

have drawn to the jury's attention.  The record shows defense counsel thoroughly cross-examined

Longoria, Alexander, and Ranger Thomas regarding the sweatshirt and the sunglasses, pointing out that the items were common items that many people own and wear, and that they did not reflect any distinguishing characteristics. Defendant has not demonstrated defense counsel was deficient in failing to object to the admission of these items. Moreover, defendant has not demonstrated that even if defense counsel was deficient in failing to object to the admission of the evidence, that it was likely the jury, in light of the substantial evidence against him, would have rendered a different verdict. Defendant's claim should be denied.

C.
<u>Not Allowing Defendant to Testify</u>

At trial, O'Neal Yarborough testified he and his wife, Barbara, told Tynisha Winkfield, their daughter, they had seen the pictures from the bank robberies and suspected defendant HUTCHERSON was the culprit. Without referencing the photos or giving other clarification, they confronted defendant and told him if he was "doing these things," to please stop. Defendant did not question what the Yarboroughs were referencing or deny his involvement, but instead replied, "Okay. I will." Mr. Yarborough also testified that at a later date, defendant admitted he had "messed up" without further clarification of his statement. Mr. Yarborough acknowledged defendant could have thought they were referring to his selling marijuana. Vol. I at 179-200.

Barbara Yarborough testified she never confronted defendant or her daughter with her suspicion of defendant being the robber shown in the bank photographs. Mrs. Yarborough averred she merely advised defendant and her daughter that she knew "what's going on, and it's got to stop." Mrs. Yarborough testified defendant responded to her request by stating he had told Tynisha Winkfield that Mrs. Yarborough "knew." Mrs. Yarborough clarified defendant never made any statements to her indicating he was the bank robber, but did indicate he would "stop." Vol. II at

315- 26.

In addition, the Government presented a letter dated July 1, 2008 from defendant to Ms.

Winkfield, after she was indicted, stating verbatim:

> I Tyrone Hutcherson Solemnly Swear that the Statement Im Writing Is True to the best of my knowledge.
>
> Around the lower end of March about 12:00 pm I entered the happy state bank went to the second teller an older lady and displayed a black hand gun from out of my back left pocket holding it with my left hand low to the counter and demanded money from the top left drawer instructing no dye packs or tracking devices after receiving the money I requested money from the left lower drawer at which time a second teller appeared (man) from the drive thru peeking around the corner then leaving I continued to request more money after receiving the money I left the bank through the left hand doors and walking across the drive thru parking lot and behind a vacant building to a car which I drove alone back to Tulia Texas arriving around 1:00 pm.  I had no accomplices and no one had any knowledge of my actions.
>
> Tyrone Hutcherson
> July 1, 2008

[sic] (Government's Exhibit AMA 10).

Defendant argues counsel was deficient because she did not allow him to testify at trial.[4]

Defendant contends he would have pointed out differences between the sweatshirt seized from his

home and that worn in the Plainview robbery, and he would have provided "his reason for his

confession to the [Amarillo] bank robbery."

As correctly noted by the Government in its response:

> A defendant's right to testify in his own defense is a fundamental constitutional right personal to the defendant.  *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987).  Thus, the "decision of whether to testify belongs to the defendant and his lawyer cannot waive it over his objection."  *United States v. Mullins*, 315 F.3d 449, 454 (5th Cir. 2002).  Counsel has a duty, however, to advise his client on why she believes it would be wise or unwise to testify.  *Id.*  When a prisoner "argues that his counsel interfered with his right to testify, the appropriate vehicle for such claims is a claim of ineffective assistance of counsel under *Strickland*."  *United States v. Willis*, 273 F.3d

---

[4]Defendant also accuses this Court of not allowing him the opportunity to testify in his defense.

592, 595-98 (5th Cir. 2001) (internal marks omitted).

Defendant HUTCHERSON has presented nothing other than conclusory self-serving statements to show he made his desire to testify known to his counsel, or that counsel did, in fact, interfere with his right to testify.  Such a non-specific allegation is not sufficient.  Assuming, *arguendo*, that defendant's claim is that counsel advised him not to testify, such claim is reviewed under the *Strickland* standard requiring a showing of deficient performance by counsel and resulting prejudice.  *See, e.g., United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992) ("Because it is primarily the responsibility of defense counsel to advise the defendant of his right to testify ... the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under Strickland ").  Even if it is assumed counsel acted unreasonably in dissuading defendant from testifying and was deficient, defendant has failed to demonstrate he was prejudiced.

As previously stated, although defendant HUTCHERSON claims he would have pointed out differences in the sweatshirt, he has again failed to identify the differences he contends existed between the sweatshirt found at the residence and the one seen in the video of the Plainview robbery.  Defense counsel elicited testimony as to the commonality of a dingy white sweatshirt, the lack of anything unusual or distinctive on the sweatshirt, as well as the fact that the witnesses were focused on acts other than the sweatshirt.  Not only does defendant fail to identify the differences in the sweatshirts that he claims he could have presented through his testimony, he does not identify any facts, other than those elicited by defense counsel, that could have been presented through his testimony.

Moreover, as noted by the appellate court, the jury heard ample evidence about Ms. Wakefield's indictment and its possible effect on defendant's decision to confess.  *Hutcherson*, No.

10-10078 at 4-5.  Defense counsel had already suggested to the jury, through the testimony of

Winkfield and the Yarboroughs, that defendant had falsely confessed because of the indictment

pending against Winkfield.  In closing argument, defense counsel argued defendant falsely

confessed in an attempt to protect Winkfield from prosecution.  Any similar testimony from

defendant as to why he confessed to the bank robbery would have done little more than to repeat the

theory already presented by defense counsel to the jury, and would have exposed defendant

HUTCHERSON to cross-examination.

Further, defendant has not demonstrated any testimony he would have given that would

have resulted in a different outcome in the jury's verdict.  As recited above, the Fifth Circuit found

the Government presented substantial evidence at trial in the form of eyewitness identification,

direct evidence in defendant's possession, his confession, and circumstantial evidence.   Moreover,

by taking the stand to testify, defendant would have subjected himself not only to vigorous cross-

examination which likely would have harmed his case, but such would have potentially opened the

door for elicitation of his criminal history.

Defendant fails to show defense counsel interfered with his right to testify, but even if it is

assumed counsel was deficient for failing to call defendant to the stand, defendant has not shown he

was prevented from presenting any aspect of his defense to the jury, especially any purported

differences in the sweatshirts or his reason for giving a confession.  Defendant fails to show the

necessary prejudice, that is "a substantial, not just conceivable, likelihood of a different result."

Defendant's claim should be denied.


D.
Uncalled Witness

Bernie Dietrich, another individual who observed the robber leaving the Plainview bank,

gave a statement to Texas Ranger Thomas "that the suspect had a gold tooth and possibly a tattoo on the right side of the neck."  Although listed as a defense witness and subpoenaed, counsel did not call Mr. Dietrich to testify.  Defendant contends defense counsel was deficient for failing to call Mr. Dietrich as a witness because his "testimony could have created reasonable doubt as to the identity" of the robber during the Plainview robbery.

Complaints of uncalled witnesses are not favored in federal habeas review because allegations of what a witness would have testified are largely speculative.  *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985) (citing *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984)); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).  In order to prevail on an uncalled witness claim, a defendant must satisfy the court concerning the substance of the uncalled witnesses' testimony.  *See Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987) ("Where the only evidence of a missing witness' testimony is from the defendant, this Court views claims of ineffective assistance with great caution"); *Cockrell*, 720 F.2d at 1427 (Cockrell failed to produce the affidavit of the uncalled witness).  A defendant must also prove that the uncalled witness would have appeared at trial, and that the witness would have testified favorably.  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Here, the uncalled witness, Mr. Dietrich, had given a statement to law enforcement after the Plainview robbery and, purportedly, the substance of any testimony Dietrich would have given at trial would have been the same as his statement.  Since Dietrich had been subpoenaed and had willingly given a prior statement, it is reasonable to assume he would have appeared at trial to testify.  However, as correctly noted by respondent, complaints of uncalled witness are also disfavored as a source of *Strickland* relief because "deciding whether to call witnesses is a strategic

trial decision." *United States v. Harris*, 408 F.3d 186, 190 (5th Cir. 2005); see also *Sayre v.*

*Anderson*, 238 F.3d 631, 635–636 (5th Cir. 2001); *Lockhart v. McCotter*, 782 F.2d 1275,1282 (5th

Cir. 1986); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983); *Buckelew v. United*

*States*, 575 F.2d 515, 521 (5th Cir. 1978).  In addition, the substance of Mr. Dietrich's purported

testimony came out during defense counsel's cross-examination of Texas Ranger Thomas.  As

noted

by the Fifth Circuit:

> During the prosecution's case-in-chief, the defense counsel elicited testimony from
> Texas Ranger Marshall Thomas on cross examination that Bernie Dietrich had been
> present after the Plainview robbery and had told Agent Thomas "that the suspect had
> a gold tooth and possibly a tattoo on the right side of the neck" (characteristics which
> other evidence showed Hutcherson did not have).

*Hutcherson*, 10-10078 at 7; *see also* Vol. 1 at 98-100.  During closing, defense counsel argued:

> We heard from Marshall Thomas that a witness outside the bank, identified as Bernie
> Dietrich who was there with his wife, observed the robber exiting the bank.  He
> described the robber as having a gold tooth and a tattoo on his neck.  There has been
> no evidence presented in this trial that [defendant] has ever had a gold tooth or a
> tattoo on his neck.

Vol. II at 391.  It certainly would have been reasonable for counsel to decide against calling

Dietrich because she was able to elicit the fact of his identification of the robbery suspect from

Ranger Thomas without subjecting the validity of the witness's identification to cross-examination.

Consequently, counsel's decision not to call Dietrich as a defense witness after eliciting the

substance of his testimony from Ranger Thomas was a strategical decision and represented sound

professional judgment.  *Pinholster*, 131 S. Ct. at 1403 ("counsel should be strongly presumed to

have . . . made all significant decisions in exercise of reasonable professional judgment").

Defendant has not rebutted this presumption by presenting any evidence showing counsel's

decision not to call Dietrich was objectively unreasonable.  This decision was within counsel's

domain, and this Court, giving strategic decisions the high level of deference they are due, cannot say such a decision rendered counsel's performance deficient.  *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Alexander*, 775 F.2d at 602.

Moreover, defendant has not shown defense counsel's decision not to call Dietrich as a witness prejudiced the defense so as to deprive him of a fair trial or due process.  Defendant has not demonstrated Dietrich's testimony would have been any better than Thomas's description, would have withstood cross-examination, or that such testimony would have been likely to affect the jury's verdict.  Consequently, defendant's claim is without merit and should be DENIED.

E.
Impeachment of Government's Witnesses

Defendant argues counsel was deficient because she failed to impeach the credibility of a Government witness (or witnesses) by presenting evidence that he or she "suffered severe mental problems" and had a "past criminal history."  Defendant's claim is without merit and should be denied.

HUTCHERSON failed to identify any specific witness in his claim of ineffective assistance, and he has not presented any evidence that any Government witness had severe mental problems. The government acknowledges witness Winkfield did have a criminal history consisting of a 1997 misdemeanor assault conviction, a 2003 misdemeanor theft conviction, and a 2003 misdemeanor conviction for failing to identify as a fugitive from justice.  However, Winkfield's testimony on direct as a Government witness was limited solely to authenticating and reading defendant's written confession to the Amarillo robbery.  Winkfield, however, was also called as a witness for the defense and any challenge by defense counsel to Winkfield's credibility as a government witness through the use of her prior criminal history would have undermined the defense's theory that

defendant wrote the confession letter only to protect Winkfield after she was indicted.  In addition, defendant has failed to show that had counsel impeached Winkfield with her criminal history, that such would have influenced the jury to such a degree that the jury would have disregarded the other evidence implicating defendant, or that there was a reasonable probability the jury's verdict would have been different.

In his response to the Government's answer, defendant appears to clarify his claim by identifying witnesses Robert Powell and O'Neal Yarbrough as witnesses defense counsel should have impeached with their "criminal record and checked past."  The claim is without merit.  First, neither of these witnesses were hostile to defendant, although their testimony would be considered harmful.  It was within defense counsel's strategy, however, whether to impeach them or not.  Secondly, HUTCHERSON has not identified exactly what counsel should have impeached the witnesses about.  While he attaches what appears to be some sort of criminal history print out, he has not identified the specific convictions which could have been used for impeachment.  Even if there were specific convictions, he has failed to show he was prejudiced by counsel's failure to impeach either of these witnesses.

Having failed to show defense counsel was defective or that defendant suffered any prejudice, defendant's claim should be denied.

## F.
## Instances of Prosecutorial Misconduct

On direct examination, Texas Ranger Thomas testified that law enforcement seized two items "from [the] residence" shared by Winkfield and defendant, to wit:  a white hooded sweatshirt and sunglasses similar to the ones worn by the bank robber during the Plainview robbery.  Vol. I at 86-87.  On cross examination, Thomas clarified that the sunglasses were found "on a rear-view

mirror of a car in front of the residence."  Vol. I at 101.  Defendant argues counsel was deficient because she failed to move for dismissal of the case for prosecutorial misconduct when the Government failed to stop and correct Thomas's testimony on direct that the sunglasses were seized "from that residence" instead of specifying they were from "a car in front of the residence."

This claim is totally meritless.  At trial, the Government simply asked what items were seized from the residence shared by Winkfield and defendant.  Ranger Thomas's testimony was responsive to the question.  On cross-examination, defense counsel clarified the specific place where the items were found.  There was no prosecutorial misconduct.  Defendant's claim should be denied.

On September 1, 2009, Special Agent Dan Richard, FBI, testified before the grand jury that one (1) day after the Plainview robbery, Winkfield "purchased a vehicle for a relative" using several $100 bills for the down payment, and that two (2) days after the Plainview robbery, she purchased another vehicle.  Richard also testified that three (3) days after the Amarillo robbery, Winkfield used sixteen $100 bills to pay off those vehicles, and noted several $100 dollar bills had been taken during both robberies.

At trial, however, the evidence showed:

> Winkfield made two substantial cash payments on a car after the robberies.  One was made two days after the Plainview robbery in the amount of $1,300 and the second was made two days after the Amarillo robbery in the amount of $1,700.

*Hutcherson*, No. 10-10078 at 3.  No evidence was presented at trial showing Winkfield purchased two (2) vehicles during April 2008.[5]

---

[5]At trial, defense counsel argued defendant's written confession should be struck because FBI Special Agent Robert Bennett falsely testified before the grand jury that Winkfield purchased a vehicle with proceeds of the Amarillo robbery (the car was purchased prior to the Amarillo robbery), and "enjoyed the proceeds of the [Amarillo] robbery by paid rent, household electronics, clothing and a car" (of which there was no evidence elicited during trial).  Counsel argued the confession was involuntary because it was the result of a wrongful indictment against Winkfield (based on what counsel contended was false grand jury testimony by Bennett).  Counsel also sought to put on evidence of the Agent's alleged perjured grand jury testimony

Defendant argues "counsel failed to raise the prosecutorial misconduct claim during his grand jury procedure," notes the vehicle purchases discrepancy, and contends "no proof was presented that the money was proceeds of a bank robbery."  The exact argument being presented is not clear.

If it is defendant's contention that counsel was deficient for failing to move for dismissal or to strike Richard's trial testimony due to it differing from his grand jury testimony about the vehicle purchases, such argument is without merit.  Richard's trial testimony did not address Winkfield's vehicle purchase or the payments made during the relevant time period and, thus, does not appear to differ from his grand jury testimony in this area.  Defendant has not identified any other inconsistencies in Richard's testimony.  To the extent there are inconsistencies in Agent Richard's grand jury testimony and his trial testimony, there is nothing to indicate such discrepancies amounted to perjury instead of mistake, or that any failure of the government to point out and correct such discrepancies amounted to prosecutorial misconduct.  No grounds existed for defense counsel to move for dismissal, to impeach, or to strike Agent Richard's testimony.  Defendant has not shown counsel was deficient.

If it is defendant's argument that counsel should have argued for dismissal for prosecutorial misconduct when the evidence at trial did not precisely support every aspect of the grand jury testimony, defendant fails to identify the legal basis for such a motion.  Moreover, defendant cannot show how any failure of counsel to move for dismissal prejudiced him at trial.[6]

---

before the jury.  The Court found the matter had been fully developed by the testimony and the danger of prejudice and confusion on the part of the jury outweighed any probative effect of any additional testimony as to what basis, or lack thereof, Agent Bennett had for his grand jury testimony.  The Court found defendant's confession should not be struck and disallowed further evidence concerning grand jury testimony.  Vol. II at 327-66.

[6]A district court may not dismiss an indictment for errors in grand jury proceedings unless such error prejudiced the defendant, and whether or not prosecutorial misconduct prejudiced a defendant depends on whether it affected the grand jury's decision to indict.  *United States v. Whitfield*, 590 F.3d 325, 359 (5th Cir. 2009).  The purported errors in the grand jury testimony identified by defendant were not so significant as to "substantially influence" the grand jury's decision to indict defendant and

If it is defendant's argument that counsel should have argued prosecutorial misconduct on the part of Agent Richard in addition to Agent Bennett (see FN. 5), defendant has not shown such argument would have been successful since the trial court determined the defense had been able to fully develop the theory that a wrongful indictment against Winkfield had been obtained to apply pressure on defendant HUTCHERSON.  Defendant's claims should be denied.

G.
Lab Results of Evidence Processed

According to police reports, an officer collected a blue baseball cap without markings in the middle of a street in a residential area near the Amarillo bank robbery which matched the description of the cap given by the teller.  *App.* at 20–26.  After a teller confirmed the cap could have been the cap worn by the robber, the officer turned it over to the lead investigator for processing.

On May 21, 2009, defense counsel filed a Motion to Compel Disclosure of Exculpatory Evidence (*Brady* Motion) requesting the Government disclose <u>any</u> evidence that is exculpatory and any evidence that could lead to evidence that is exculpatory.  The motion set forth a non-exhaustive list of examples of items that would be exculpatory.  In its response to the *Brady* motion, the Government recognized its discovery obligations and noted it would disclose any information as mandated by *Brady*.  On September 8, 2009, the Court ordered the Government to disclose all exculpatory and impeaching evidence.  Defendant HUTCHERSON points out the motion did not specifically request information "regarding the hat found a block of the Happy State bank."

Defendant contends "counsel was ineffective when she failed to request the lab results" of the cap.  Defendant contends "counsel failed to investigate any and all facts regarding said evidence

cause him prejudice.

knowing the possibility that results from the hat could have been key evidence in [defendant's] trial. Defendant argues "counsel was provided police report copies that provided information about the cap and made no attempt to file any request for the results nor made any attempts to question the investigating officers testifying in this matter."  Defendant maintains the lab results "could have created reasonable doubt before the jury."

First, the *Brady* motion requested <u>all</u> exculpatory evidence possessed by the Government or any that could lead to the discovery of exculpatory evidence.  It was not necessary for defense counsel to specifically request "lab results" of the cap in order to obligate the Government to disclose any exculpatory evidence as a result of any testing of the cap.  Counsel was not deficient in failing to make a specific request.

Second, there is no indication in the record or other reports and there is no evidence before the Court that the ball cap was ever submitted for testing or DNA analysis.  Even if counsel had included a specific request in the *Brady* motion, defendant has not shown there were any lab results for the Government to disclose.

Third, while counsel could have questioned the officers as to why the cap was not further analyzed and/or could have had independent testing performed on the cap, defendant has not shown how he was prejudiced by the failure to do so.  Defendant has not shown he would have benefitted from questioning the officers concerning the cap by showing their testimony would have aided the defense, has not shown any independent tests would have been "negative" or would have aided the defense in any way, nor has he shown a reasonable probability that any questioning or testing would have resulted in a different jury verdict in light of the other evidence presented during trial. Defendant has not shown he was prejudiced by any deficiency of trial counsel.  This claim should be denied.

H.
Five-Level Increase Under USSG § 2B3.1(b)(2)(C)

During trial, the victim teller of the Amarillo robbery testified that the robber "put a gun down on the counter" during the robbery.  Vol. I at 114, 118, 120, 135, 137.  The Government introduced a BB pistol, described as looking "like a black nine-millimeter semiautomatic pistol," found in a case in the closet of defendant's bedroom.  Vol. II at 215, 217-18.  Lieutenant McKenney, the Amarillo Police Department officer who found the pistol in a case in the bedroom closet, opined that the BB pistol was not a firearm "by law" and fires BBs or pellets.  Vol. II at 219.  In closing argument, the Government noted "the gun" was found in defendant's closet, Vol. II at 386, and argued that "[i]n the closet was a gun that matched the gun in the robbery."  Vol. II at 389.  In the PSR, defendant was assessed a 5-level increase for brandishing or possessing a firearm during the commission of an offense under USSG § 2B3.1(b)(2)(C) because "defendant laid a firearm on the counter in front of the teller which was seen by the teller."

By this ground, defendant contends counsel was deficient for failing to object to the 5-level enhancement because "evidence presented at trial established that a firearm wasn't involved."  The Guidelines define a "firearm" as "(i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device."  USSG § 1B1.1, App. N.1(G).  The Guidelines state a "weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm."  *Id.*  Defendant contends counsel should have argued the gun brandished during the Amarillo bank robbery was not a "firearm" justifying a 5-level increase and should have argued, instead, for a 3-level increase for brandishing a "dangerous weapon" under USSG § 2B3.1(b)(2)(E).

Defendant's argument, of course, is based on the premise that the black BB pistol seized from his residence and admitted into evidence was, in fact, the weapon used during the Amarillo bank robbery.  If it was the gun used in the Amarillo robbery, it would, as defendant argues, be excluded from the definition of a firearm and would not qualify for the 5-level increase.  At most, it would subject defendant to the 3-level increase for a brandishing a dangerous weapon.  While the BB pistol was similar to the description given by the teller at the Amarillo bank of the gun used during the robbery, the teller testified defendant brandished a "black gun."  She did not state it was a BB pistol.  Further, in his handwritten confession letter, defendant stated he brandished "a black hand gun."  He did not state it was a BB pistol.  The PSR, relying on this evidence of record, recommended the 5-level increase.

The Government contends, "A [PSR] generally bears sufficient indicia of reliability to be considered as evidence by the district court in resolving disputed facts."  *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995).  "If information is presented to the sentencing judge with which the defendant would take issue, the defendant bears the burden of demonstrating that the information cannot be relied upon because it is materially untrue, inaccurate, or unreliable."  *United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010) (internal marks omitted).  Without any "testimony or other evidence . . . submitted to rebut the information in the PSR, the district court [is] free to adopt the PSR's findings without further inquiry or explanation."  *Id*.; *see also Valencia*, 44 F.3d at 274 ("A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence.").

At the sentencing hearing, defendant advised the District Judge he had reviewed the PSR with defense counsel and, after the Court addressed defense counsel's objections, indicated there

was nothing in the PSR that was not correct.  Although presented with the opportunity to do so, defendant did not make any correction to the PSR regarding the handgun and has not presented any evidence to show the BB pistol found at his residence was, in fact, the "black gun" brandished during the Amarillo bank robbery.  Consequently, while defendant HUTCHERSON may have a question of why the Government would even introduce the BB gun into evidence, his claim at this late stage, and after he affirmatively stated the PSR was correct, is not valid.  Defendant has not rebutted the presumption that defense counsel acted reasonably, nor has he demonstrated counsel was deficient, in failing to object to the 5-level enhancement.

More importantly, this issue is not critical and HUTCHERSON was not prejudiced.  Even if trial counsel had objected to the 5-level enhancement, and such objection was sustained, the elimination of the enhancement would not have impacted defendant's total offense level and guideline range since defendant was a career offender.  The adjusted offense level for defendant's Amarillo bank robbery, including the 5-level assessment, was 28.  His combined adjusted offense level when both the Plainview and Amarillo bank robberies were combined was 29.  However, when the career-offender provision was applied defendant's total offense level was 32.  Any objection to the 5-level assessment would not have affected the application of the career-offender provision, the calculation of defendant's total offense level, or the calculation of his guideline range, nor would an objection have had any effect on defendant's sentence.  Consequently, defendant cannot show he was prejudiced by defense counsel's failure to object to the 5-level enhancement.  Defendant's claim of ineffective assistance of counsel should be DENIED.

I.
Career-Offender Provision Under USSG § 4B1.1

Defendant argues counsel was deficient because she did not object to the application of the

career-offender provisions at sentencing.  Defendant contends the Government "failed to present the proper predicates" to prove defendant's prior convictions were qualifying convictions and, absent an objection from counsel, "allowed the [Court] to rely on the PSI recommendation to apply the career offender status."

On direct appeal, defendant argued the district court erred in applying the "career offender" designation because it relied solely on the Pre-Sentence Report [PSR] for its finding that defendant had two prior convictions that qualified him as a career offender.  Since there was no objection at trial, the appellate court reviewed the issue for plain error[7] rather than *de novo*.  The appellate court found documents submitted by the Government in a supplemental appellate record supported the career offender designation, and held it would not have been error – plain or otherwise – for the trial court to consider the supplemental documents if they had been submitted prior to sentencing.  The appellate also found there was not a reasonable probability the trial court would fail to apply the career offender enhancement if the case were remanded for resentencing.  The court concluded defendant could not show the trial court's error in relying only on the PSR affected his substantial rights and, thus, there was no plain error.

While it is true counsel could have objected to the enhancement, defendant has not shown he was prejudiced by the failure to do so.  Although a lesser standard of review was applied on appeal, the ultimate determination was that the career offender enhancement was properly applied.  Upon objection at sentencing, it is reasonable to assume the Government would have simply supplied the trial court with the same documents it provided in the supplemental appellate record, which documents supported the career offender designation.  Defendant has not shown any prejudice by

---

[7]To demonstrate plain error, defendant had to show any error was clear or obvious, and that it affected his substantial rights.  *United States v. Jones*, 596 F.3d 273, 276 (5th Cir. 2010).

counsel's failure to object to the career offender enhancement at sentencing.

Further, this issue was fully addressed and rejected on direct appeal, and should not be relitigated in this 2255 proceeding.  *See United States v. Kalish*, 780 F.2d 506, 508 (5th Cir.1986) ("issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions.").  This claim should be denied.

## J.
### Remaining Claims

All of defendant HUTCHERSON's claims which do not involve allegations of ineffective assistance of counsel are addressed below.  HUTCHERSON is not entitled to relief on any of these claims because they all could have been raised on direct appeal.  Since HUTCHERSON has not shown cause for the failure to raise these claims on direct appeal, they are not cognizable in a motion to vacate.  *United States v. Shaid*, *supra*.  In any event, even if these claims could be presented, they are without merit.

## V.
### EVIDENCE FROM ILLEGAL SEARCH

By his second ground, defendant argues his "conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure."  Defendant claims "the consent to search provided by his live-in girlfriend was coerced by agents who pressured her into changing her mind with a compromised agreement not to charge her with other contraband found in the residence." Defendant contends evidence seized from his residence in violation of the Fourth Amendment was used against him during trial to secure his conviction.

Defendant's Fourth Amendment claim is not cognizable in this section 2255 proceeding. The Supreme Court held in *Stone v. Powell*, 428 U.S. 465, 494-95 & n. 37, 96 S.Ct. 3037, 49

L.Ed.2d 1067 (1976), that state prisoners collaterally attacking their convictions under section 2254 cannot obtain relief for violations of the Fourth Amendment exclusionary rule when the prisoner was provided a full and fair opportunity to litigate the Fourth Amendment issue in the state courts. Interpreting the "full-and-fair-opportunity" requirement in the section 2254 context, the Fifth Circuit has stated that when a defendant fails to raise his Fourth Amendment claim at trial (as occurred here), then *Stone* precludes habeas relief on Fourth Amendment grounds, even though no state hearing was held on the claim. *See Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir.1978) ("An 'opportunity for full and fair litigation' means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes."). The *Stone* rule can be raised by a court *sua sponte*. *See Davis v. Blackburn*, 803 F.2d 1371, 1372-73 (5th Cir.1986) ("[W]e are obliged to apply *Stone* as a prudential limitation on the exercise of our jurisdiction ..., even if it must be raised *sua sponte*."). Thus, the Government's failure to assert the *Stone* bar does not prevent this court from applying it to defendant's claim. Although the Supreme Court has not definitively resolved the question of the applicability of *Stone* in section 2255 proceedings, dicta in *United States v. Johnson*, 457 U.S. 537, 562 n. 20, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) indicates that the doctrine does apply. The Fifth Circuit has extended the *Stone* rule to federal prisoners bringing section 2255 claims. *United States v. Ishmael*, 343 F.3d 741, 742 (5th Cir. 2003), *cert. denied*, 540 U.S. 1204 (2004). Consequently, defendant's claim should be denied as barred by *Stone.*

Lastly, even if this court were to consider this claim, defendant has not shown an agreement by law enforcement not to arrest or charge an occupant of a home for collateral paraphernalia, not the focus of the investigation, would render the consent to search involuntary. Defendant's claim

should be denied.

## VI.
### EVIDENCE IN VIOLATION OF *BRADY*

Again, according to police reports, an officer collected a blue baseball cap in the middle of a street in a residential area near the Amarillo bank robbery which matched the description given by the teller. *App.* at 20–26. After the teller confirmed the cap found could have been the cap worn by the robber, the officer turned it over to the lead investigator. Defendant contends the cap was tested for DNA and that the results excluded defendant. Defendant thus contends the government withheld exculpatory evidence in violation of *Brady v. Maryland.*

A prosecutor's suppression of evidence materially favorable to a defendant's guilt or punishment violates due process. *Brady v. Maryland*, 462 U.S. 111 (1983). To prevail on a Brady claim, a defendant must show the prosecution suppressed evidence favorable to the defense that was material. *United States v. Infante*, 404 F.3d 376, 386 (5th Cir. 2005). For favorable evidence to be considered material, a defendant must show that had it been disclosed, there is a reasonable probability that the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Defendant has completely failed to show the Government did, in fact, suppress any materially favorable evidence. There is no indication in the record or other reports, much less actual evidence, that the cap at issue was ever submitted for DNA testing, or if it was tested, that the result came back "negative." Moreover, defendant has failed to show that if there had been "negative" results of DNA testing, and had such been disclosed, that there is a reasonable probability the result of the proceeding would have been different considering the other evidence against defendant. In fact, it is simply not reasonable that the jury would have reached a different

verdict if they had been presented with evidence that a cap found in the middle of the street in a residential area behind the robbed bank did not contain DNA consistent with defendant's DNA. Defendant's claim should be denied.

## VII.
## PROSECUTORIAL MISCONDUCT

As noted above, FBI Agent Richard testified before the grand jury that one (1) day after the Plainview robbery, Winkfield "purchased a vehicle for a relative" using several $100 bills for the down payment, and that two (2) days after the Plainview robbery, she purchased another vehicle. Richard further testified that three (3) days after the Amarillo robbery, Winkfield used sixteen $100 bills to pay off those vehicles, and noted several $100 dollar bills had been taken during both robberies. Contrary to this grand jury evidence, the evidence at trial showed Winkfield only made two (2) substantial cash payments on one (1) car after the robberies: one made two days after the Plainview robbery in the amount of $1,300, and the second made two days after the Amarillo robbery in the amount of $1,700. No evidence was presented showing Winkfield purchased two (2) vehicles during April 2008.

By his fourth ground, defendant contends the Government committed prosecutorial misconduct when it "allowed the testimony of Agent Richard to go uncorrected when he testified that [defendant's] girlfriend purchased a vehicle for a relative and then purchased another vehicle the next day." While claims of prosecutorial misconduct typically involve improper comments or statements made by the Government and a determination of whether the defendant was prejudiced, this court will review defendant's claims broadly to determine if the prosecution engaged in "intentional misconduct that seriously prejudice[d] the defendant."

Like similar claims he presented as ineffective assistance of counsel claims, defendant's

argument here is unclear.  If it is defendant's contention that the Government committed prosecutorial misconduct and denied defendant due process when it failed to correct Richard's <u>trial</u> testimony when it differed from his grand jury testimony, such argument is without merit.  Again, Richard's trial testimony did not address Winkfield's vehicle purchase or payments during the relevant time period and, thus, did not differ from his grand jury testimony in this area.  Defendant's claim is without merit.

If it is defendant's contention that the Government committed prosecutorial misconduct and denied defendant due process when the evidence elicited at trial differed from previous grand jury testimony, defendant fails to show what steps the Government should have taken at that stage of the proceedings, nor has defendant shown how any failure of the Government prejudiced him at trial or denied him due process.  Moreover, even if the grand jury believed Winkfield made two vehicle purchases rather than making one purchase with two payments, the trial jury heard evidence as to the exact date of purchase and amounts and dates of payments.  Any error in the grand jury proceedings regarding evidence to ensure probable cause existed was cured by the jury trial on the issue of guilt.  *United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986).  Defendant's claim should be denied.

VIII.
<u>SUFFICIENCY OF THE EVIDENCE</u>

Lastly, defendant notes that since the beginning of his trial, he has claimed "innocence of the Counts charged."  Defendant points to what he considers deficiencies in the evidence to show the government did not establish he was the individual who committed the bank robberies.  Defendant argues:  (1) no DNA evidence connected defendant to the robberies; (2) witness testimony was inconsistent with original statements; (3) witnesses with potential exculpatory

evidence were not called to testify; (4) the witnesses' identification of defendant was untrustworthy because the photo lineup was unduly suggestive; (5) no DNA testing was conducted on the sweatshirt to confirm it had, in fact, been worn by defendant; and (6) the sweatshirt displayed during trial was not the same sweat shirt worn by the perpetrator in the bank security video.

Although phrased as a claim of actual innocence, defendant is actually making a sufficiency of the evidence argument.  Defendant has shown neither cause nor prejudice for his failure to raise his sufficiency of the evidence arguments on direct appeal, and is thereby procedurally barred from raising these issues in a section 2255 proceeding.  *See United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir.1991) (en banc).  Moreover, sufficiency of the evidence claims are not cognizable on a collateral motion under section 2255.  *Forester v. United States*, 456 F.2d 905, 907 (5th Cir. 1972). Lastly, the evidence of defendant's guilt was more than sufficient.  Defendant's claim should be DENIED.


IX.
RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody filed by defendant TYRONE LUVOID HUTCHERSON be, in all things, DENIED.


X.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 19th day of July 2013.


_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).